# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **TYLER D. KEENER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Cause No. 1:14-cv-1518-WTL-DKL** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Tyler Keener requests judicial review of the final decision of the Defendant, Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("the Commissioner"), discontinuing the Supplemental Security Income Benefits ("SSI") he received as a child.  The Court, having reviewed the record and the briefs of the parties, rules as follows.

## I.      APPLICABLE STANDARD

Section 1614(a)(3)(H) of the Social Security Act ("the Act") provides that individuals who receive SSI as children must have their disability redetermined upon attaining the age of eighteen.  The disability rules used for adults apply to this determination.

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months."  42 U.S.C. ' 423(d)(1)(A).  In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience.  42 U.S.C. ' 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. ' 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. ' 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. ' 416.920(a)(4)(iii). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. ' 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. ' 416.920(a)(4)(v).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1176.

2

## II.     PROCEDURAL HISTORY

Tyler Keener received SSI as a child due to his disability; on April 1, 2011, he attained the age of eighteen.  On November 17, 2011, it was determined that Keener was not disabled under the rules for adults who file new applications.  Keener requested and received a hearing before an Administrative Law Judge ("ALJ").  The hearing, during which Keener was represented by counsel, was held on December 12, 2012.  Also present at the hearing either in person or by telephone were Keener's mother, John A. Pella, M.D., and Jack Thomas, Ph.D., medical experts, and Robert Barber, a vocational expert.  ALJ John H. Metz issued his decision on January 15, 2013, finding that Keener's disability ended on November 17, 2011.  After the Appeals Council denied review of the ALJ's decision, Keener filed this timely appeal.

## III.     THE ALJ'S DECISION

As noted above, Keener received SSI as a child; upon attaining the age of eighteen, redetermination of his disability found that he was no longer disabled as of November 17, 2011. At steps two and three, the ALJ concluded that since November 17, 2011, Keener had the severe impairments of "ptosis of the bilateral eyes, speech disfluency, social phobia, mild mental retardation, and learning disability," R. at 30, but that his impairments, singly or in combination, did not meet or medically equal a listed impairment.  At step four, the ALJ determined that Keener had

> the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations:  the claimant is limited to an environment that does not require speech as an important component.  Additionally, the claimant is restricted from reading very fine print. The claimant could perform tasks that require one to four steps.  He is capable of occasional contact with the general public, co-workers, and supervisors.  The claimant would require an environment that does not involve frequent changes. Finally, he would need a job where talking to others was not part of the job requirements.

3

*Id*. at 32.  The ALJ found that Keener had no past relevant work, but at step five, considering

Keener's age, education, work experience, and RFC, the ALJ determined that Keener could

perform a range of work that exists in the national economy, namely as an apparel sorter,

packing line worker, and housekeeper.  Accordingly, the ALJ concluded that Keener's disability

ended on November 17, 2011, and that he had not become disabled again since that date.

## IV.    EVIDENCE OF RECORD

### A.  Background

Tyler Keener was born on April 2, 1993. He was six weeks premature and weighed three

pounds, nine ounces at birth. His twin brother, Anthony, was born three hours before Keener.

Keener was placed on nasogastric tube feedings and an apnea monitor. He remained in the

hospital until he was two weeks old.

Neither of Keener's parents is a high school graduate. Keener's father attended school

until 12th grade but did not graduate, and Keener's mother completed 9th grade. They were

unmarried but in a long-term committed relationship.

Keener attended developmental preschool and Kindergarten at IPS #49 before starting

first grade at IPS #31. He repeated both first and third grade. He was in a sixth grade "inclusion

classroom." *Id.* at 304. An inclusion classroom appears to be a reference to special education

services provided within the general education environment: http://www.myips.org/Page/34208.

He received services for Language Arts. Keener dropped out of school after ninth grade; at

almost age 17, he had no high school credits.

Keener's speech was difficult for outsiders and even family members to understand. As a

child, he had severe delay in articulation, vocal intensity, and expressive language skills, and

those impairments affected his education, social, emotional, and vocational development. His

tongue protruded from his mouth most of the time during at least one period of his childhood.

4

A report from a psychological evaluation in 2003 documented Keener's difficulties: "Throughout testing Tyler was very quiet and displayed articulation difficulties. He had great difficulty sustaining his mental effort for more than 30 seconds. He was slow at processing information and with the work output. If he was hurried he would shut down. He needed extra encouragement to look at the examiner and to raise the level of his voice." *Id.* at 311.

Despite several surgeries to correct the condition, Keener suffered from ptosis, which caused his eyelids to droop and sometimes kept his eyes from fully closing. Because of Keener's eye condition, his father had to help him wash shampoo out of his hair. His father also helped him shave. Keener was unable to tie his shoes or write his name in cursive. Keener would help his mother feed the family's cats. He also would help pick up trash, with his mother holding the bag and telling him what to do. He was able to microwave frozen meals. Keener even had a difficult time looking family members in the eye. When extended family would come over, he would often go to another room.

Keener's mother had sought treatment for him from Midtown Community Mental Health Center. Services were initiated in January 2010. The report notes indicate, "Tyler presents with symptoms of social phobia and depressive disorder nos [not otherwise specified] as evidenced by refusal to leave the home, symptoms of anxiety and worry when thinking about leaving the home or being at school, only going out with family members once he's had time to process and plan for the outing, and sadness and irritability on a daily basis." *Id.* at 351.  The provider further clarified that Tyler's diagnoses were "evidenced by severe anxiety in and avoidance of social situations, refusal to leave the home, sadness and displeasure over his anxiety, and feelings of hopelessness regarding how to make the situation better." *Id.* at 352. The goals of treatment were established for Tyler to "go back to school and not be so nervous all the time." *Id.*

Keener did miss several scheduled therapy sessions due to illness, a family emergency, or simply not being home when the provider arrived for the session. One report stated, "Both Tyler and his mother are not very engaged in services, since start of care (2/10) Tyler has only been seen twice for individual session." *Id.* at 368. When Keener returned to school in fall 2010, the provider was scheduled to meet with him at school.

As Keener's agoraphobia worsened as he got older, it became more difficult for him to leave his home. He would want to go out and would put on a hat and sunglasses to hide himself, but then he would need to return to the house. Although he had wanted to and seemed resolved to attending school in fall 2010 and even expressed excitement to his counselor at going, he was ultimately unable to regularly attend school. He would begin shaking and was unable to get out of his mother's van once they were actually at the school. Ultimately, Keener stopped attending school altogether, and therapy services were discontinued.

## B.  Evaluations

At the direction of the Disability Determination Bureau, on September 14, 2011, Keener was given a mental status and level of intellectual functioning assessment by psychologist Paul A. Deardorff, the director of "ForPsych: A Forensic Psychology Practice."  Dr. Deardorff had access to Keener's 2010 Midtown progress records. When assessing Keener's mood and affect, Dr. Deardorff made the following observation: "Tyler appeared to be anxious as he was a very quiet boy who avoided eye contact. He displayed no spontaneous speech. He displayed stiff arm movements at times as well. His presentation was somewhat suggestive of autism. He spoke and moved slowly and appeared to have little energy." *Id.* at 468.  In assessing, Keener's speech, Dr. Deardorff observed: "Tyler was a very quiet boy who displayed no spontaneous speech. He generally responded to questions with rather brief responses. His phraseology, grammatical structure, and vocabulary suggested that he was intellectually limited. His articulation was poor

6

as only approximately 75% of his comments were intelligible within context while only approximately 50% of his comments were intelligible outside of context." *Id.*

Dr. Deardorff tested Keener for placement on the Wechsler Adult Intelligence Scale, and the results indicated a full scale IQ of 48. Dr. Deardorff documented that Keener was "functioning in the moderately retarded range of intelligence," *id.* at 469, noting that his IQ was "slightly lower than would be expected on the basis of his clinical presentation," *id.* at 470.  Dr. Deardorff also found that Keener's presentation was "somewhat suggestive of autism." *Id.*  His DMS-IV Multiaxial Classification include an Axis 299.80 R/O Pervasive Developmental Disorder.

Keener's prior IQ tests also showed higher scores than the results of Dr. Deardorff's testing. His childhood test results were in the low average to average range, which was not consistent with the results of Dr. Deardorff's IQ testing.

When Keener was evaluated on July 26, 2011, a speech and language pathologist found that his speech was intelligible by the familiar listener greater than 80% of the time and the unfamiliar listener less than 70% of the time.

Dr. Ann Lovko reviewed the available medical evidence and found on October 4, 2011, that Keener's medical disposition was "RFC Assessment Necessary" and "Coexisting Nonmental Impairment that Requires Referral to Another Medical Specialty." The Medical Disposition was based on 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders. She also found "MER depression nos" as a medically determinable impairment under affective disorders. Under anxiety-related disorders, she found "MER and CE social phobia." Dr. Lovko found mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. She found that the evidence did not establish the C criteria for 12.04 or 12.06.

In the Functional Capacity Assessment, Dr. Lovko found "inconsistent follow through with treatment parent not holding clmt accountable." *Id.* at 494. Dr. Lovko also found, "Clmt is not credible due to significant discrepancy in IQ score compared to those in school record without any intervening event to explain this. While clmt appeared to have social anxiety in 2010, most recent notes show improvement." *Id.*

Dr. Benetta Johnson reviewed the available medical evidence and found that an RFC Assessment Necessary and Coexisting Nonmetal Impairment(s) that Requires Referral to Another Medical Specialty. The Categories upon which the medical disposition was based were 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders. She also found a nos medically determinable impairment was present under 12.04. Under 12.06, she found social phobia. Dr. Johnson found mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. She found that the evidence did not establish the C criteria for 12.04 or 12.06.

### C. Hearing Testimony

### 1. Tyler Keener

The first witness at the hearing was Tyler Keener. From the first question the ALJ asked of him, Keener struggled:

> ALJ: State your full name for me, please
> CLMT: I'm kind of - - I can't - - well, Keener, Tyler, yeah, Tyler Keener.
Well - -

*Id.* at 49.

After questioning Keener's attorney about the nature of the impairments Keener was alleging, the ALJ told Keener, "[I]n this case, I am the most important person here and then you

become the second, you're the second important person. We're making this good deal." *Id.* at 51.

The following exchange then took place between Tyler and the ALJ:

> Q: Now, can you tell me your date of birth, sir?
> A: All right. April the 10th – April, April 7th, April 7th.[1]
> Q: And what year?
> A: In '93, I think.
> ATTY: He said '93.
> ALJ: '93? Okay, that's fine.
> BY ADMINISTRATIVE LAW JUDGE:
> Q: And is this – Mr. Keener, is this the loudest you can talk to me?
> A: Yeah.

*Id.*

Keener was able to answer that his age was 19 and that he was not married, but the answers were elicited only after much prodding. *Id.* at 52. The ALJ then decided to halt Keener's testimony to hear from medical experts in the case. After hearing from the experts, the ALJ tried to question Keener again:

> Q: Have you been listening to what we've been saying?
> A: (No audible response)
> Atty: Have you been listening to what's been going on?
> Clmt: Okay. Well, well, okay.
> Atty: I don't think he understands - -
> ALJ: He doesn't understand that?
> Atty: - - Judge. Yes.
> ALJ: You see the questions I've been asking different people, I've been getting different answers and things, have you been listening to that?
> Clmt: What?
> Atty: Have you been listening to everything?
> Clmt: I, I, I honestly - - and, yeah - -

*Id.* at 81-82.

Realizing that the words Keener was saying were of limited value, the ALJ made the following statement. "[N]ormally I would ask, but it would be a waste of my time, it seems, I

---

[1] Records indicate that Keener's actual date of birth is April 2, 1993.

normally would ask questions like do you have a girlfriend? Did you ever have a girlfriend? Do you have any – joined any clubs at school, things like that, but I'm going downhill on those things." *Id.* at 87.

### 2. Dr. John Pella

John Pella, M.D., testified at the hearing based on his examination of the medical evidence of record. Dr. Pella testified that Keener had visual difficulties and was born prematurely. Kenner had a condition known as blepharophimosis, a restriction of the eye opening, and had surgeries to correct the problem. Keener's corrected vision was 20/50 in both eyes. Dr. Pella also testified that Keener has disfluent speech, which had been present his whole life but appeared to have improved over time. Keener spoke in a low voice and started and stopped when speaking. Speech evaluations in September 2011 showed that Keener did have some speech pathology. One evaluation found that his speech pattern was intelligible 80 percent of the time when speaking to people familiar with his speech and 70 percent or slightly below when speaking to people unfamiliar with his speech. The other evaluation found that his speech was intelligible 60 percent of the time to people familiar with his speech and 50 percent of the time to people who were unfamiliar with his speech pattern. Dr. Pella testified that Keener did not meet or equal a listing.

Commenting on Keener's presentation at hearing, the ALJ made the following statement to Dr. Pella, who apparently was testifying by phone:

> Okay. Now I'm watching him. Obviously, you can't see him, but this is what I want to know. I'm watching the young man and not only does he appear extremely disinterested in what's occurring but he tends to bob back and forth, I mean, and his head. He'll look up at the ceiling, then he'll look up at the wall and it's hard to tell whether he's actually concentrating or he's just – has no interest at all in what I'm doing.

*Id.* at 56. Dr. Pella indicated that "I'm not sure I saw that pattern of behavior in the records . . .

that I reviewed." *Id.*  Dr. Pella testified that Keener's functional limitations would be

communication, so he would trend toward occupations where speech was not an important

component of what he was doing. The ALJ again questioned Dr. Pella about Keener's behavior

in court:

> Now there's another thing I have - - I'm making observations and you might be
> able to help, maybe not. Again, I'm not a doctor. I'm watching him play with his
> hands, okay, and as he's really disinterested in me, he's got his right - - let me see,
> his left hand and he keeps playing with his mouth with his left hands and then
> sometimes he plays with his right hand. Is that attributed to any of the
> impairments we've been talking about?

Dr. Pella responded, "Not that I could confirm through the medical record, Your Honor, no."

*Id.* at 58.

### 3. Dr. Jack Thomas

Jack Thomas, a state-certified clinical psychologist, testified at the hearing based on his

examination of the mental health related medical evidence. Dr. Thomas testified that Keener had

a valid diagnosis of social phobia. However, the diagnosis did not meet the listing requirements

of 12.06. In support of this, Dr. Thomas referred to a note from Midtown indicating that Keener

was returning to school. He thus characterized Keener's social phobia as "somewhat resolved."

*Id.* at 61. Dr. Thomas's testimony stated that the IQ scores on which Dr. Deardorff based his

assessment were not valid as they were "suppressed." *Id.* at 63. Dr. Thomas pointed to Keener's

previous IQ scores that were in the borderline to average range. Keener also had Vineland scores

in the low average to average range. Dr. Thomas found that Keener was in the average/low

average range on adaptive functioning and that Keener's presentation at the hearing and before

Dr. Deardorff were not typical.

Dr. Thomas testified that Keener could perform one to four steps. Keener could have occasional contact with the general public, co-workers, and supervisors. When Dr. Thomas testified, the following exchange occurred between the ALJ and Dr. Thomas:

> Q: Now, you're seeing how he's reacting in front of me, correct?
> A: Yes.
> Q: Okay. Now, is that attributed to a mental problem or a physical problem?
> A: Your Honor, it's not, it's not - -
> Q: It's not mental?
> A: - - attributed - - it's not attributed to mental. . . . They did consider – the issue of autism was raised, but only by Dr. Deerdorff.[sic]
> Q: Right.
> A: The, the, the, the people who have examined him, the school, well, they know him really well and they didn't - -
> Q: Not at all, no.
> A: --they didn't see it and –

*Id.* at 69-70.

Dr. Thomas did not think Keener was in special education, although Keener was receiving speech services. He testified that nothing in the record indicated that Keener would be unable to follow verbal or written instructions. The documentation did not support a finding that Keener would need a job coach.

When questioning Dr. Thomas, the ALJ directly expressed his skepticism as to the authenticity of Keener's behavior:

> Q: I have a – and I'm going to be very blatant and, right, I'm going to ask you directly on it, is he pulling a scam on me?
> A: Judge, I, I would say that I, I don't have anything written down that would account for his behavior today, adequately account for –
> Q: Okay
> A: – the non-communicative, for the autistic-like stereotype –
> Q: Right.
> A: –repetitive stereotype behavior. You know, they did say at one point in the record that he, you know, that he has trouble looking at people –
> Q: Okay
> A: –but that – but even the treating therapist didn't talk very much about that and the, the observations that they made of him at school did not reveal anything and, and I think that would have been documented.

Q: Uh-huh

A: So I would say the behavior today is atypical and I – but I, you know, but I can't say why it is occurring. It – I, I cannot give you a syndrome –

Q: Okay

A: – that would account for it.

*Id.* at 74-75. This exchange followed Keener's inability to articulate why he had not graduated from high school. Dr. Thomas testified that Keener was not autistic. If Keener's presentation at the hearing was legitimate, he would have a severe impairment. Based purely on Dr. Thomas' observation of Keener at the hearing, the impairment would be very similar to somebody who had a very severe case of autism. Dr. Thomas clarified that it seemed to be autism plus some type of communication disorder. However, he testified that no records said that Keener was autistic, and Keener was not presenting the same way when Dr. Deardorff examined him.

### 4. Karen Keener

Karen Keener, Keener's mother, testified that Keener had never lived alone; he lived with her, his twin brother, and his father. He had never had a girlfriend. He saw his pediatrician. He had received psychiatric treatment but then stopped. Keener dropped out of school after ninth grade. He had received school services at home through Emmanuel, but it was stopped due to budget cuts. He was receiving Cs and Ds and Fs. When Keener tried to go to school, he couldn't. He'd "freak[ ] out" and get scared. *Id.* at 94.  Keener's mother reported that he'd been tested and was borderline autistic when he was around 10 years old. However, he'd never been formally diagnosed as autistic.

Keener's mother explained his behavior and presentation at the hearing as how he was around people. He could not look family members in the face. He'd been in speech therapy and special education classes on and off. Keener did not drive and had never tried to get a license. Keener had a twin brother, and they were identical "inside and out." *Id.* at 103. Keener and his brother presented themselves the same way, and his brother received disability because of his

agoraphobia. At home, Keener also looked around and chewed on his fingers as he was doing in court.

Keener's mother never left him alone because he could not take care of himself. If she or his father was unable to be present, her niece would come. Keener was good with the family's cats, and he never had physical altercations with family members. He never had tried to hurt himself or been hospitalized for psychiatric treatment.

Keener's mother wanted him back in school, but she couldn't get him out of her van. Keener tried and got ready and wanted to do it, but he got up there and "he just couldn't. He couldn't breathe. He broke out in a sweat." *Id.* at 111. Keener never belonged to any clubs, and he had been to church twice. In church, he sat in the back and listened for a little bit and then was ready to leave. When relatives would come to Keeener's home, Keener would sit at the table and listen and then go off to another room. He could use a telephone. He could ride a bicycle but was shaky on it.

While he could bathe himself, his dad would sometimes help him get out shampoo. He could dress himself.  He could microwave things and make a sandwich but could not do laundry because he got "freaked out easy."  R. at 116. He could vacuum but was not very good at it. He did not garden. The hearing in front of the ALJ was the first hearing Keener's mother had attended.

### 5. Robert Barber

Robert Barber, vocational expert, testified that a hypothetical 19 year old with a ninth grade education who had received speech therapy could work as an apparel sorter, packing line worker, or housekeeper. A person presenting as Keener presented during the hearing would not get past the interview without a job coach.

# V.   DISCUSSION

Keener argues that the ALJ failed to fully develop the record as needed and appropriately weigh consultative examination findings. Doc. 14. The Court agrees.[2] It is clear that the ALJ based his decision on his belief that Keener was malingering at the hearing. However, the picture painted by the ALJ is inconsistent with the record as a whole. The Seventh Circuit consistently has found error where an ALJ relies only on the evidence that is supportive of the ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record. *Moore v. Colvin*, 743 F.3d 1118, 1123-24 (7th Cir. 2014); *see also Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (noting prohibitions against "cherry-picking" only evidence favorable to the ALJ's conclusion). That is what occurred in this case. As the Court explains below, the ALJ used selected information while ignoring or improperly discounting evidence that failed to support his conclusion.

First, the ALJ gave "little weight" to examining consultant Dr. Deardorff, crediting instead the opinion of non-examining consultant Dr. Thomas. Dr. Deardorff is an examining provider chosen by the Agency, so the ALJ can reject his opinion "only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *see also* 20 C.F.R. § 416.927(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). Here, the ALJ did not provide a valid explanation for preferring the record reviewer's analysis over that of the agency's examining doctor.

---

[2] Keener also argues that he met or equaled the listing level requirements for 12.06-anxiety related disorders. The finding regarding the second prong of 12.06(B) will also need to be reexamined on remand after the medical evidence is reevaluated.

The ALJ discussed Dr. Deardorff's opinion, laying out the findings and stating, "I am assigning little weight to Dr. Deardorff's clinical findings for the reasons stated above by the medical expert." R. at 37. With respect to the medical expert, Dr. Thomas, the ALJ found,

> Dr. Thomas testified that the claimant's autistic presentation at the hearing and at the consultative examination was quite different from the medical records. He stated that there is no medical evidence that supports the claimant's non-communicative or autistic like behavior. Dr. Thomas indicated that the claimant's presentation at the hearing was even more severe than his presentation at the psychological consultative examination, and it was atypical. . . . Dr. Thomas' testimony shows a careful analysis of the claimant's impairments, and it was based on a thorough review of evidence, including the findings of the consultative examination physician. Further, his determinations are credible because they are supported by objective clinical findings and treating progress notes in the record. Accordingly, I am according great weight to Dr. Thomas' testimony.

*Id.* at 36.

The ALJ's reliance on the opinion of Dr. Thomas is misplaced. Dr. Thomas, and, by extension, the ALJ, gave weight to selected records from Midtown Mental Health, which provided mental health counseling to Keener beginning in January 13, 2010. In the January 13, 2010 meeting to initiate services, the Midtown provider found that: "Tyler presents with symptoms of social phobia and depressive disorder nos as evidenced by refusal to leave the home. Symptoms of anxiety and worry when thinking about leaving the home or being at school, only going out with family members once he's had time to process and plan for the outing, and sadness and irritability on a daily basis." *Id.* at 351.  The provider further clarified that Tyler's diagnoses were "evidenced by severe anxiety in and avoidance of social situations, refusal to leave the home, sadness and displeasure of his anxiety, and feelings of hopelessness regarding how to make the situation better." *Id.* at 352. The goals of treatment were established for Tyler to "go back to school and not be so nervous all the time." *Id.*

Both Dr. Thomas and the ALJ relied on a Midtown report from September 17, 2010, in which the provider reported that Keener "has begun attending more regularly. Tyler reports that

16

he really enjoys attending school and is glad he isn't doing home bound instruction. Tyler reports that he has started to make friends with the peers and is doing very well adjusting to attending school again." *Id.* at 397.  This led them to conclude that his phobia was "somewhat resolved," *id.* at 35, 61, completely ignoring the later Midtown records that suggest that was not the case.

Of critical importance, and ignored by both the ALJ and Dr. Thomas, are the events that followed the September 17, 2010, Midtown report.  When, within a month of the report being filed, the Midtown provider attempted to meet with Keener at school on seven separate days, Keener was absent each time. This is corroborated by Keener's mother's testimony that, despite attempts, Keener refused to even get out of the family van to attend school. *Id.* at 91. Keener in fact never returned to school.

In the end, the ALJ's decision seems rooted in his belief that Keener was attempting to "scam him" and therefore his -- and apparently his mother's -- allegations regarding his condition were not credible. The following exchange occurred between the ALJ and Keener's attorney:

> ATTY: And I would suggest – you mentioned scamming a few times.
> ALJ: Uh-huh
> ATTY: You know, I think by observing him, and he'd be deserving of an Academy Award right now if he was actually trying to scam. This is
> ALJ: He'd be competing with Dana Lewis,[3] I think, so I think –
> ATTY: Right. Right.
> ALJ: -- he'd lose –
> ATTY: So I don't –
> ALJ: -- on that.
> ATTY: There's been some great performances as you're – and I'm not denying that, but –
> ALJ: Yes, I think so, too.
> ATTY: -- I –
> ALJ: Get his mom in here.

---

[3] Presumably the ALJ was referring to Daniel Day-Lewis, who won an Academy Award for best actor in a leading role for his portrayal of Christy Brown, an artist who had spastic quadriplegia, in *My Left Foot.*

*Id.* at 87.

With respect to Keener, the ALJ found, "The claimant did not testify during the hearing. I note that the claimant presented with an autistic presentation at the hearing. The claimant's head was bopping and he was unable to answer any of the questions asked by the undersigned or the claimant's representative." *Id.* at 33. The ALJ also pointed to Keener's change in demeanor when Keener's mother was testifying:

> I note that the claimant's presentation was completely different while his mother was testifying. Mr. Keener was able to concentrate on his mother's testimony, and answer his mother's questions during her testimony. I find that the claimant's behavior was inconsistent during the hearing, and this is in contrast with autistic behavior.[4] It is emphasized that this observation is only one among many being relied on in reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.

*Id.* at 37. The ALJ characterized the testimony of Keener's mother as such:

> Ms. Keener testified that the claimant stays at home and he is afraid to leave their house. Ms. Keener reported that the claimant acts in the same way autistic manner [sic] at home, as he did at the hearing. However, the medical evidence does not support her subjective allegations. Treatment notes dated March 25, 2010, indicate that Ms. Keener reported to the claimant's therapist that Tyler as [sic] out in the community with family members (Ex 5F/16). Similarly, Ms. Keener reported on April 9, 2010 that Tyler had gone out of the house during the previous week for his birthday party (5F/21).

*Id.* at 38. The ALJ also mentioned later treatment notes that show excursions outside the home and Keener's positive remarks about school. *Id.* Further, the ALJ said of the report provided by Keener's mother, "I am assigning little weight to the third party function report dated August 27, 2011 provided by the claimant's mother (Ex 4E) because it is inconsistent with the record as a whole." *Id.* at 39.

_____

[4] The Court cautions that an ALJ should not play doctor. *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")

From the record, it is clear Keener has profound impairments dating back to birth. The stress of being in a court proceeding understandably could have exacerbated those impairments.[5] The ALJ's command to get Keener's mother implied that she had not been present in the room prior to her testimony, including when Keener was attempting to testify. Given that his mother was his primary caregiver and was seldom apart from Keener, her absence also could have had a deleterious effect on Keener's stress level, decreasing his ability to communicate and understand the proceedings. It seems quite probable that Keener's demeanor would change when his mother entered the room and began speaking. Had Keener in fact been acting, it would stand to reason that he would continue to act throughout the proceeding rather than purposefully switch his behavior during his mother's testimony.  The degree of skepticism displayed by the ALJ is inexplicable.

In explaining why he discounted Keener's presentation and the testimony of Keener's mother at the hearing, the ALJ relied primarily on records from Midtown Mental Health, pointing out that Keener was on track to return to school in May of 2010.[6]  However, as previously discussed, the Midtown notes document that ultimately Keener did not return to school. *Id.* at 406. His mother testified that Keener was in the van in the parking lot but she was

---

[5] As his mother noted, "he's probably a nervous wreck." R. at 100. She had taken him to the doctor the morning of the hearing because he was feeling very sick and had collapsed on the floor. *Id.* at 99-100, 504.

[6] The ALJ's decision stated, "I note that the medical evidence is in contrast with the claimant's autistic and non-communicative presentation at the hearing. The medical evidence indicates that the claimant's social phobia was improving with therapy, and he was able to interact with his therapist and peers at school (Ex 5F). The claimant's therapist documented on May 26, 2010 that the claimant engaged easily and seemed proud to report the changes he was making (Ex 5F/47)." R. at 37.

unable to get him to come in. *Id.* at 91. "He couldn't breathe. He broke out in a sweat." *Id.* at 111.

> The ALJ also notes that
>
> the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. Although he has received some extremely conservative treatment for the allegedly disabling impairment in the form of therapy, there is a conspicuous lack of psychiatric treatment. Ms. Keener testified that the claimant is not currently treating with any medication or a psychiatrist. Ms. Keener stated that the claimant only treats with a pediatrician, and he has never had a formal diagnosis of autism. She related that the claimant has never been hospitalized for psychiatric treatment. Finally, the medical evidence indicates that the therapy has been generally successful in controlling the claimant's symptoms (Ex. 5F).

*Id.* at 38. The Court notes that it is not difficult to imagine a situation in which parents with twin disabled sons would not have the wherewithal to seek an additional diagnosis. Nor is it difficult to imagine that an overtaxed school system, Indianapolis Public Schools, lacked the resources to devote to seeking an additional diagnosis. Keener's mother had taken him to Midtown Community Mental Health Center, but that treatment had ended when Keener was unable to return to school. She reported calling an agency to seek additional treatment but being told that there was nothing they could do.[7]

One final note. The hearing transcript leaves the Court with the impression that the ALJ did not afford the proceeding the respect and dignity it deserves. Several of the ALJ's comments are demeaning to Keener and his mother.  The ALJ commented that Keener was "presenting himself in front of me as that he's totally mentally retarded, and he's not." *Id.* at 96. The ALJ also inserted what he must have believed were humorous comments into the proceedings. For

---

[7] During the hearing in front of the ALJ, Keener's mother clearly was confused about whether Keener had waived his right to a lower level hearing. The transcript leaves the impression that she was not aware that Keener could have had such a hearing. R. at 117-19.

example, when Keener's mother reported that Keener's grades were Cs and Ds and Fs, the ALJ

responded, "The same as me and look where I ended up." *Id.* at 93. Likewise, when Keener's

mother testified that the school had stopped providing homeschooling, the ALJ responded:

> Q: And you didn't sue them? .. . What's wrong with you? You could have
> had a case for that."
> A: No, it - - no, it - -
> Q: I could have done the case for it.

*Id.* at 93-94.

The ALJ's fatuous comments even disparaged the Commission. When Keener's mother

reported that Keener's identical twin brother was receiving disability, the ALJ responded:  "What

quacky Judge ruled in his favor, then?" He added, "And doesn't - - and giving rulings without

evidence . . . that would support it?" *Id.* at 104. When Keener's mother explained that there was

no judge, the ALJ replied, "Some quack on the lower level gave it to him?" and interrupted

Keener's mother by saying "Jesus Lord" when she tried to explain. *Id.* at 105. It is unclear

whether the ALJ prejudged Keener's case or whether Keener's behavior at the hearing led him to

make such remarks. In any case, the Court finds that Keener did not the fair consideration from

the ALJ that he deserved.

## V.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **REVERSED** and

this case is **REMANDED** to the Commissioner for further proceedings consistent with the

Court=s Entry. The Court strongly urges the Commissioner to assign this case to another ALJ

upon remand, and strongly urges that ALJ to not only review the entire record as it stands, but

also to consider whether any additional evidence should be obtained. *See, e.g.*, *Green v. Apfel*,

204 F.3d 780, 781 (7th Cir. 2000) ("[T]he procedure for adjudicating social security disability

claims departs from the adversary model to the extent of requiring the administrative law judge

to summon a medical expert if that is necessary to provide an informed basis for determining

whether the claimant is disabled.").

SO ORDERED: 9/24/15

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication